IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES : | |
| : | |
| v.          : | 06cr184 (EGS) |
| : | |
| ROBERT WRIGHT : | |

DEFENDANT'S SENTENCING MEMORANDUM

Robert Wright, the Defendant, respectfully submits the following memorandum to aid the Court in determining an appropriate sentence.

On February 28, 2007, Mr. Wright pled guilty to distribution of 5 grams or more of crack cocaine on April 28, 2004 . His sentencing was postponed in part to afford Mr. Wright the opportunity to obtain gastric bypass surgery, a procedure which Mr. Wright's doctor has advised is necessary to prolong his life beyond the current five year life expectancy.

Since Mr. Wright was returned to the community on July 19, 2007, PTSA has notified the Court of 8 alleged infractions of the conditions of Mr. Wright's release.[1]  Those infractions are as follows:

failed to report for drug testing:
3/13/08
3/11/08
3/4/08
2/28/07
2/12/08
12/27/07

submitted a sample positive for use of cocaine:
3/6/08
1/22/08

---

[1]In addition, Mr. Wright missed two hearings convened to discuss his non-compliance with the conditions of release.  On both occasions, PTSA verified that Mr. Wright was hospitalized.

A Doctor's note excused Mr. Wright's failure to report for a period of two months beginning on 1/2/08.[2] Thus, 2/12/08 and 2/28/08 should be removed from the above list of alleged infractions. Likewise, a Doctor's note essentially ordered bed rest for Mr. Wright for a three month period beginning on September 17, 2007.[3] While no note technically covered Mr. Wright's failure to report on 12/27/07, nonetheless, a Doctor believed it best for Mr. Wright's health that he not exert himself for five months surrounding 12/27/07, and it would be reasonable to assume that there was not a three week period between 12/17/07 and 1/2/08, when Mr. Wright's medical condition so improved that it was medically acceptable for him to be exerting himself as he necessarily does in transporting his 500+ pound body to and from the courthouse for drug testing.

Likewise, while no Doctor's note technically covered Mr. Wright's failure to report in March 2008, again since a Doctor believed it best for Mr. Wright's health that he not exert himself for *at least* the six month period leading up to March 2008, it would be reasonable to assume that Mr. Wright's medical condition had not so improved in March 2008, that it became medically acceptable for him to exert himself.

Despite having a Doctor's excuse not to report in the three months leading up to 12/17/07, and again for a period of *at least* 2 months following 1/2/08, Mr. Wright did report for drug testing on 13 occasions between 10/4/07, and 3/13/08. On 11 out of the 13 occasions, Mr. Wright submitted clean samples free from any evidence of water loading. Thus, while much has been made of Mr.

---

[2] A note signed by Dr. Ali on 1/2/08 instructs: "This is to certify that Mr. Robert Wright is suffering from hypertension, DHF, diabetes [UI], [UI] hypertension and obesity - He is advised not to physically exert himself for at least 2 months and then to be re-evaluated."

[3] Mr. Wright's discharge order from the Specialty Hospital of Washington, dated 9/17/07, includes the instruction, signed by Dr. Ali, to: "Limit your walking to around the house only for 3 months."

Wright's alleged non-compliance with the conditions of his release, the fact remains that he was overwhelmingly in compliance or had a medical excuse for non-compliance.

With regard to securing the gastric bypass surgery, Mr. Wright made as much progress as could be expected. As is evidenced by the attached documentation, Mr. Wright had his initial consultation for gastric bypass surgery on May 16, 2006, and received information regarding the 8 prerequisite procedures and/or tests he would need to complete prior to surgery. On June 30, 2006, Mr. Wright had a gastric biopsy in the department of anatomic pathology at Providence Hospital. On March 10, 2008, Mr. Wright completed the pulmonary examination with Dr. Earl Armstrong. However, in May, 2008, Mr. Wright was advised that his heart was too weak to undergo gastric bypass surgery. Thus, the Court should not view Mr. Wright's inability to get the surgery as evidence of any failure or squandered opportunity on Mr. Wright's part.

It is not in dispute that Mr. Wright's medical condition is life threatening. It is counsel's understanding that previously assigned AUSA Aaron Mendelsohn spoke personally with Mr. Wright's doctor, who confirmed that without the gastric bypass surgery, Mr. Wright cannot be expected to live more than five years. It is worth noting that AUSA Mendelsohn's conversation with the Doctor, and the Doctor's five year life expectancy prediction – occurred prior to February 2007. Assuming that the Doctor's prediction has not changed, since, indeed, Mr. Wright has not had the surgery, Mr. Wright is not likely to live beyond February 2012.

Under the circumstances, the five year statutorily required sentence more than adequately punishes Mr. Wright for his conduct. If Mr. Wright is lucky enough to survive the five years in jail, he will not have long to live upon his return to society.

Moreover, the unique facts of Mr. Wright's distribution of five grams or more of crack cocaine warrant a sentence of no more than five years. In April 2004, when Mr. Wright distributed the crack cocaine, there was no question that distribution of 60.2 grams crack cocaine would net a far more severe sentence than would the distribution of 60.2 grams of powder cocaine.[4]

The "CI"'s request for crack, instead of the powder cocaine which Mr. Wright had agreed to sell, was undoubtedly made at the government's request and to achieve the goal of securing indictments that charged crimes with the longest potential sentences. As Mr. Wright pointed out during his PSR interview, he was prepared only to sell powder cocaine. Because he did not know how to cook up crack cocaine, Mr. Wright had to get co-defendant Debra Hicks to cook the powder in order to comply with the CI's request for crack, as opposed to powder cocaine.

Mr. Wright admits that he is, ultimately, responsible for the distribution of 60.2 grams of crack cocaine. However, under the circumstances where Mr. Wright intended to sell powder cocaine, and only at the CI's insistence, had his co-defendant cook the powder into crack cocaine, Mr. Wright's sentence should be no greater than the 5 year mandatory minimum. If Mr. Wright had been convicted of selling 60.2 grams of powder cocaine, his base offense level would have been 16 for that offense, with a consequent guideline range of 27-33 months, and no statutory mandatory

---

[4] It was not until 2005, that Circuits began publicly wrestling with the implications of *Booker* in sentencing crack offenders more severely than their powder cocaine counterparts. *See. e.g., U.S. v. Eura,* 440 F.3d 625 (4th Cir 2006); *U.S. v. Pho,* 433 F.3d 53 (1st Cir 2006). Both aforementioned cases were argued in the winter of 2005.

minimum.[5]  Under the circumstances, Mr. Wright should be sentenced as close to that range as is allowed by law: to the 5 year statutory mandatory minimum.

I.      Sentencing Crack Cocaine Offenders After *Pickett* and *Kimbrough*

Sentencing of crack cocaine offenders is informed by the D.C. Circuit's recent decision *United States v. Pickett,* 475 F.3d 1347 (D.C. Cir. 2007), and the Supreme Court's decision *Kimbrough v. United States,* 128 S.Ct. 558, 169 L.Ed.2d 481 (2007).

In *Pickett,* our circuit ruled that it was reversible error for a sentencing judge to refuse to take into account the 100:1 ratio perpetuated in §2D1.1 of the Guidelines, "and the problems [that ratio] raises in sentencing crack cocaine dealers" 475 F.3d at 481.  In *Kimbrough,* the Supreme Court reversed the Fourth Circuit's holding that an outside Guidelines sentence is *per se* unreasonable when based solely on disagreement with the 100:1 ratio perpetuated in §2D1.1. 128 S.Ct at 573-74. Instead, *Kimbrough* instructed, judges may and should consider the disparity between the Guidelines' treatment of crack and powder offenses. *Id..*

Thus, it is now settled that this Court can and should consider the disparate treatment of crack versus powder cocaine offenders, and take into account, among other things, the sentencing disparity created by a Guidelines range 100 times greater for crack than for powder cocaine offenders.

In this case, Mr. Wright pled guilty to distributing 60.2 grams of crack cocaine.  Pursuant to his written plea agreement, Mr. Wright also acknowledged as additional "relevant conduct," 78.7

---

[5]This computation excludes the powder and crack cocaine, heroin, and gun found in Mr. Wright's apartment on March 10 and August 25, 2005.  Mr. Wright's guidelines computation including the additional drug amounts, is addressed in section I below. The gun, the parties agree, should not increase Mr. Wright's guidelines. *See* section II below.

grams of powder cocaine, 247.8 grams of crack cocaine, and 2.9 grams of heroin recovered during the execution of two subsequent search warrants. With Mr. Wright's criminal history of 4, *i.e.,* category III, the resultant Guideline range for the drugs is 108-135 months. A person convicted of possessing with intent to distribute, instead, a total of 326.5 grams of powder cocaine and 2.9 grams of heroin, would face a base offense level 22, with resultant Guidelines range 51-63 months.

Because of the unique circumstances of this case, in which Mr. Wright sought to sell powder as opposed to crack cocaine, and indeed possessed with intent to distribute an amount of powder cocaine subsequently, undersigned counsel urges the Court to consider, instead of a 100:1 ratio in this context, a 1:1 ratio, *e.g.,* to adopt the Guidelines range applicable to the possession with intent to distribute powder cocaine: 51-63 months.

II.     The Two Point Gun Bump Does Not Apply in Calculating Mr. Wright's Guidelines Range[6]

Paragraph 20 in the final presentence report reflects the addition of two points pursuant to Sentencing Guidelines §2D1.1(b)(1), which provides that 2 points are to be added "if a dangerous weapon "was possessed." As application note 3 makes clear, however:

> The enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons. The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense. For example, the enhancement would not be applied if the defendant, arrested at his residence, had an unloaded hunting rifle in the closet.

application note 3, §2D1.1.

Here, the government, through AUSA Jean Sexton, agrees that the 2 point gun bump is inapplicable.

---

[6] Counsel noted a timely objection supported by analysis, to the assessment of the 2 point gun bump by executing the comments section to the receipt and acknowledgment form accompanying the original presentence report.

WHEREFORE, Mr. Wright asks that the Court take these matters into account in fashioning an appropriate sentence of not more than five years.

                              Respectfully submitted,


                              _____/s/_____
                              Nikki Lotze
                              Roberts & Wood
                              6801 Kenilworth Avenue, #202
                              Riverdale, MD 20737
                              (301) 699-0764

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Defendant's supplemental memorandum in aid of sentencing has been delivered via facsimile and by mail, this ___ day of _____ , 2008, to:

AUSA Jean Sexton
Office of the States Attorney
555 Fourth Street, NW
Washington, D.C. 20530

                         _____/s/_____
                         Nikki Lotze