UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | Criminal Case No. 06-184-01 (EGS) |
| v. | : | |
| **ROBERT E. WRIGHT,** | : | Sentencing Date: June 19, 2008 |
| Defendant. | : | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits the following memorandum to assist the Court in issuing an appropriate sentence in this case.

## PROCEDURAL BACKGROUND

1. On March 6, 2007, the defendant pled guilty to Unlawful Distribution of 5 Grams or More of Cocaine Base, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(iii).[1] The defendant's plea was pursuant to an agreement with the Government, and carries a maximum statutory penalty of not less than five years and not more than 40 years imprisonment, a fine not to exceed $2,000,000, or both.

2. As recounted in the defendant's Sentencing Memorandum, since the date of the plea, the Pretrial Services Agency has informed the Court of numerous infractions committed by the defendant while on release. See Def. Mem. at 1-3. After the most recent infraction, the Court

---

[1] The Presentence Report ("PSR") indicates that the defendant pled guilty to Possession of 5 Grams or More, rather than Distribution, but that is not correct. See PSR at 1; Plea Agreement (Doc # 31). As the statute section and the base offense level under the Sentencing Guidelines are the same for both offenses, the error has no impact on the possible sentence facing the Defendant.

revoked the defendant's release and held him without bond pending sentencing.

3.  In the Presentence Investigation Report dated January 31, 2008, the defendant's base offense level was increased by two levels for a firearm that was recovered during the execution of a search warrant on the defendant's residence that occurred on March 10, 2005.  See PSR at ¶6.  The defendant opposed that two-level increase based on the fact that the distribution charge that the defendant pled guilty to occurred on April 28, 2004, almost eleven months earlier.  See Def. Opp. Mem. at 1.  The Government does not oppose the defendant's position.

4.  Without the two-level increase for the firearm, the defendant's total offense level is 29.  With a criminal history category of III, the defendant's guideline range for imprisonment is 108 to 135 months.  See PSR at ¶ 78.

## FACTUAL BACKGROUND

5.  At the time of his plea, the defendant acknowledged certain relevant criminal conduct by signing a factual proffer.  Specifically, the defendant admitted that on April 28, 2004, at approximately 6:15 p.m., at 2503 Rhode Island Avenue, N.E., Washington, D.C., co-defendant Deborah Hicks was inside of her residence at the above location when defendant Robert Wright came over.  Defendant Wright had earlier met and had a discussion with a confidential informant (CI) working with agents from the Drug Enforcement Administration (DEA) about the purchase of cocaine base, also known as crack cocaine.  The CI had given Wright $2,000 in U.S. Currency, after which Mr. Wright removed an object from the trunk of his car and walked with the object into the residence of co-defendant Hicks.

6.  After approximately ten minutes, the CI walked over to co-defendant Hick's residence and began to call out to defendant Wright.  Co-defendant Hicks walked outside of her residence

and spoke briefly with the CI. Hicks then re-entered her residence and came back outside with a brown paper bag, which she handed to the CI. The CI looked inside of the bag and saw that it contained a plastic bag with a large amount of crack cocaine, which had just been cooked-up and was still warm and soft to the touch.

7. Co-defendant Hicks told the CI that Wright would soon be coming outside of her residence. The CI waited outside of Hick's residence until defendant Wright came outside. The CI asked defendant Wright if it was "straight," and Wright responded that he had given the CI an extra "seven grams over." The CI then left the area with the DEA agents.

8. The DEA analyzed the cocaine base distributed to the CI and confirmed that the substance was 60.2 grams of cocaine base, also known as crack, with a 56% concentration.

9. On March 10 and August 25, 2005, Metropolitan Police Department officers executed two search warrants upon the defendant's residence at 2505 Brentwood Road, N.E., Washington, D.C., and recovered, among other narcotics paraphernalia and personal items belonging to the defendant, the following narcotics: (1) 247.8 grams of cocaine base; (2) 78.7 grams of cocaine hydrochloride; and (3) 2.9 grams of heroin hydrochloride. Furthermore, during the execution of the March 10, 2005, search warrant, the officers recovered a black .380 caliber Davis Industries handgun loaded with four live rounds of ammunition. The defendant possessed the above narcotics with the specific intent to distribute them.

10. The DEA conducted forensic analysis of the cocaine base recovered from the defendant's residence and confirmed the presence of cocaine base, with the above net weight and a concentration of between 75-85%. The DEA also conducted forensic analysis of the cocaine hydrochloride recovered from the defendant's residence and confirmed the presence of cocaine

hydrochloride with the above net weight and a concentration between 53-62%. Finally, the DEA conducted forensic analysis of the heroin hydrochloride recovered and confirmed the presence of heroin hydrochloride with the above net weight and a concentration of 7.2%.

## ARGUMENT

11. Considering the sentencing factors enumerated in 18 U.S.C. § 3553(a), the guidelines and policies promulgated by the United States Sentencing Commission, and given the nature and circumstances of the defendant's criminal actions in this case, his criminal history, his limited acceptance of responsibility, and his repeated violations of his conditions of release, the Government requests that the Court sentence the defendant to 108 months in jail.

12. Pursuant to 18 U.S.C. § 3553(a)(1)-(2), in sentencing the defendant, the Court shall consider not only the nature and circumstances of the offense, but also the need for the sentence to reflect the seriousness of the offense, to provide for just punishment, to deter the defendant and others from this type of criminal conduct, and to protect the public from further crimes of the defendant. The facts of this case clearly show that the defendant is not someone who made a mistake one time. Rather, this is an individual who distributes or possesses with the intent to distribute large amounts of drugs for a living. Even if one assumes for the sake of argument that the defendant's first foray into the world of drug distribution occurred on April 28, 2004, when he sold over sixty grams of cocaine base to a CI for $2,000, by March and August of 2005, law enforcement officers had recovered over 247.8 additional grams of cocaine base, 78.7 grams of cocaine hydrochloride, and 2.9 grams of heroin hydrochloride which, by the defendant's own admission, he possessed with the intent to distribute. Moreover, the officers also recovered a loaded, .380 caliber handgun loaded with four rounds of ammunition. This type of criminal

conduct is, by statute and by common sense, "dangerous" and it is defined as such not only because of the danger inherent in the drug/gun combination, but also because of the incredible harm that these drugs do to a community. The Court's sentence should reflect that. The five years requested by defense counsel is the *minimum* allowed by the statute, and that is not sufficient under the facts of this case.

13. Moreover, in addition to numerous other convictions and arrests, the defendant sold the sixty grams -- and possessed more than triple that amount with the intent distribute it -- after having been previously convicted in District Court of Distribution of Cocaine Within 1,000 Feet of a School; Possession with the Intent to Distribute Ten Grams of a Substance Containing PCP; and Distribution of Cocaine. See PSR at ¶ 33. And, his compliance on parole in that case, like his compliance in this case, was "poor." Id. ("Reporting as directed . . . were consistent problems for Mr. Wright . . ."). Clearly the defendant needs more than the bare minimum sentence so that he, and those he has dealt with, are adequately deterred from committing this type of offense yet again. He should not be able to say, "I only got the bare minimum even though the police caught me with a total of over 300 grams of cocaine base, and even though I had priors, and even though I repeatedly violated my conditions of release...."

### The Defendant's Acceptance of Responsibility

14. The defendant's attempt to downplay his role in this case, to limit his responsibility, should also cause the Court to pause before accepting the defendant's recommendation for the minimum sentence.[2] According to the PSR, while agreeing with the Statement of the Offense

---

[2]The Government is not arguing that the defendant should not receive the three-level reduction for acceptance of responsibility. He acknowledged the conduct in the Statement of Offense and pled guilty.

(see Doc # 30), Mr. Wright said that he would sell powder cocaine to support his personal drug habit, but that he was doing a "favor for a friend," that he is "not a crack dealer," and that it was the Confidential Informant who asked for the powder cocaine to be "cooked."  See PSR at ¶ 16. Mr. Wright then argues in his Sentencing Memorandum that "[t]he 'CI's' request for crack, instead of powder cocaine which Mr. Wright had agreed to sell, was undoubtedly made at the government's request and to achieve the goal of securing indictments that charged crimes with the longest potential sentences."  See Def. Mem. at 4.  The defendant goes on to say that because he really would have sold only powder cocaine but for the CI's insistence on having crack cocaine, he should therefore get the minimum five years in jail.  Id.   This is so ridiculous that it is almost offensive in that it suggests that the Court and the Government have no common sense.

15. If the Court were to look at the actions of the defendant only on April 28, 2004, when he sold the sixty grams of cocaine base to the CI for $2,000, then perhaps the defendant's claim that he is "not a crack dealer" might be at least somewhat plausible.  But the defendant's actions did not stop there.  On March 10, 2005, and August 25, 2005, two search warrants were executed at the defendant's residence at 2505 Brentwood Road, N.E..  During both searches, the officers and agents from the Federal Bureau of Investigation recovered additional amounts of crack cocaine.  In fact, they recovered an additional 247.8 grams of crack cocaine, as well as 78.7 grams of cocaine hydrochloride, and 2.9 grams of heroin hydrochloride.  See Statement of Offense (Doc. #30).[3]

---

[3]The March 10, 2005, seizure list was attached to the Defendant's Memorandum in Opposition to the Two Level Enhancement because that was the date that the law enforcement officers also recovered the gun.  The August 25, 2005, seizure list, as well as all of the corresponding DEA Laboratory Reports containing the analysis of substances that were recovered on those two dates were turned over to defense counsel as part of discovery.

16. And it does not stop there either. As the PSR indicates, on March 3, 2006 – *after* the sale of the sixty grams of cocaine base to the CI, and *after* the execution of the two search warrants in which an additional 247.8 grams of cocaine base were recovered – the defendant was arrested for possession of a ziplock bag containing 15 rocks of cocaine base that he had tried to conceal in his mouth. See PSR at ¶ 35. The defendant subsequently pled guilty to that charge.

17. And it does not stop there either. On April 23, 2008, *while the defendant was pending sentencing in ths case,* the police executed yet another search warrant at the defendant's residence at 2505 Brentwood Road, N.E., during which a scale was recovered in the living room, and empty ziplock bags and a knotted piece of plastic containing suspected cocaine base were recovered in a bedroom. An individual staying with the defendant was charged with the narcotics found that day, but as the attached copy of the sworn Affidavit in Support of An Application for Search Warrant indicates, the warrant was obtained based on a CI's observations the week of April 17, 2008, of a large amount of suspected crack cocaine in the defendant's residence which, according to the CI, belonged to "Big Man," who was subsequently identified as Robert Wright. See Ex. 1, Search Warrant and Affidavit in Support Thereof. As Mr. Wright was pending sentencing in this case at the time the search warrant was executed, there should have been no scale in the living room, let alone more crack cocaine in a bedroom in his house.

18. The defendant's repeated contacts with cocaine base show not only that he is a recidivist who needs to spend a significant amount of time in jail, but also they undermine his claim that he is "not a crack dealer." To the contrary, he is certainly a crack dealer, and he deals in significant amounts of narcotics – not just cocaine base, but also powder cocaine and heroin – which makes him very dangerous to the community.

19. The Court should also reject the defendant's argument that he should get the minimum five years in jail because, but for the CI's request for crack cocaine, he would not have been facing as much time because he would have sold powder cocaine instead. See Def. Mem. at 4. Putting aside that there is no comfort in the fact that someone is allegedly a big-time powder cocaine dealer instead of a big-time crack cocaine dealer, the Court of Appeals has specifically rejected this so-called "sentencing entrapment" argument. See United States v. Walls, 70 F.3d 1323, 1328-29 (D.C. Cir. 1995), cert. denied, 116 S. Ct. 1445 (1996); see also United States v. Webb, 134 F.3d 403, 408-09 (D.C. Cir. 1998). As the Court of Appeals noted in Walls:

> That [the defendants] would have sold powder cocaine had the agents not negotiated for crack proves only that [the defendants] were predisposed to commit both offenses. . . . [They] distributed crack cocaine when given the chance. The punishment they deserve is for the crimes they actually committed, crimes they were surely predisposed to commit.

Walls, 70 F.3d at 1329 (internal citations omitted). While the defendant is obviously not requesting that the Court sentence the defendant below the mandatory minimum, he is suggesting that the Court sentence him to the bare minimum of five years for the same reason that was rejected by the Court of Appeals in Walls. That argument is improper and should be rejected by the Court.

### The Defendant's Health Issues

20. The defendant also argues that he should get the minimum five years in jail because, "[i]f Mr. Wright is lucky enough to survive the five years in jail, he will not have long to live upon his return to society." See Def. Mem. at 3. While the Government is not in a position to

argue whether the defendant is, or is not, a viable candidate for gastric bypass surgery, or whether the failure to have the surgery will result in his death by 2012 as claimed by defense counsel, the Court should not be swayed by defense counsel's blatant attempt to appeal to the Court's sympathy.  The Court gave the defendant chances, over and over again, to complete the medical appointments necessary to have the surgery and he did not do so.  As noted in his Sentencing Memorandum, the defendant's first consultation for the surgery was May 16, 2006, and he was given information about eight prerequisite procedures.  By May, 2008, he still had not completed the necessary appointments.  See Def. Mem. at 3.

      21.  Although the Government is obviously not in the position to discuss why the defendant failed to accomplish the eight prerequisites in a two year period, it is clear that he used his condition as an excuse for why he could not participate in drug testing on the schedule ordered by the Court.  And while he did provide a vague note about not exerting himself, the Court, at the request of the Pretrial Services Officer, specifically instructed the defendant that the vague note was not sufficient and that he would need to provide a more detailed doctor's note in order for the Court to change the conditions of release.  See Docket Entry dtd 2/11/08 ("It is further ORDERED that absent a clear directive from a doctor that coming to the Courthouse constitutes over-exertion, the conditions of pretrial release remain unmodified.")  In response, after repeated attempted contacts by the Pretrial Services Officer, Mr. Wright provided yet another vague note, and still failed to show up for testing.  It was because of Mr. Wright's continuous, blatant disregard of the Court's Orders that he was held without bond at his last appearance.  The Court should consider that repeated lack of compliance, and the revocation of his parole in his other District Court case, in sentencing the defendant as well.

22. Finally, to be very clear, the Government is *not* suggesting that the defendant's medical condition should just be ignored, and nor will it be. As the excerpt from the attached Federal Bureau of Prisons ("BOP") "Program Statement" indicates, the BOP has a comprehensive program to "deliver medically necessary health care to inmates" to include "[m]edical conditions that are of an immediate, acute or emergent nature, which without care would cause rapid deterioration of the inmate's health, significant loss of function, or may be life-threatening," and "[m]edical conditions that are not immediately life-threatening but which without care the inmate could not be maintained without significant risk of serious deterioration leading to premature death. . . ." See Ex. 2, at 1, 4-5.[4] Quite simply, the BOP is not going to ignore Mr. Wright's health issues.

WHEREFORE, for the above reasons, the Government respectfully requests that the Court impose a sentence of 108 months.

>
> Respectfully submitted,
> JEFFREY A. TAYLOR
> United States Attorney
>
> BY:     _____/s/_____
> JEAN W. SEXTON
> Assistant United States Attorney
> NJ Bar No. 02122-1995
> 555 4th St., N.W. Room 4235
> Washington, D.C. 20530
> (202) 305-1419
> Jean.Sexton@usdoj.gov

---

[4]The BOP's "Program Statement" is sixty pages long. Although only the first six pages are attached as Exhibit 2, the undersigned Assistant will have the full "Program Statement" available at sentencing for the Court's and Defense Counsel's review. It is also available on the Bureau of Prisons website at www.BOP.gov.